**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 1:22-cv-02304-NYW-KLM

PAUL ARCHER, and
ARCHER FOR COLORADO,

      Plaintiffs,

v.

JENA GRISWOLD, Colorado Secretary of State in her official capacities,

      Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

      Pending before the Court is Plaintiffs Paul Archer ("Plaintiff Archer" or "Mr. Archer") and Archer for Colorado's ("Archer Campaign Committee" and collectively with Mr. Archer, "Plaintiffs") "Emergency Application for Preliminary Injunction" (the "Application" or the "Motion") [Doc. 12, filed October 19, 2022].[1]  Defendant Jena Griswold ("Defendant" or the "Secretary") timely responded to the Motion.  [Doc. 19, filed October 26, 2022].  The Court subsequently conducted an evidentiary hearing on October 28, 2022 ("Preliminary Injunction Hearing").  *See* [Doc. 26].  At the hearing, the Court took one objection as to hearsay under advisement.  [Tr. at 12].[2]  This matter is now ripe for resolution.  Having considered the Parties'

---

[1] Generally, when citing to the record, this Court refers to the document number assigned by the Court's Electronic Court Filing ("ECF") System, except as to the exhibits admitted in evidence during the Preliminary Injunction hearing.  Those exhibits are referred to by the exhibit number used during the Preliminary Injunction hearing, to facilitate ease of reference with the hearing transcript.

[2] Due to the expedited nature of this proceeding, citations to the hearing transcript ("Tr.") refer to the real-time transcript prepared by this Court's reporter.  That transcript is not final.

arguments and the entire record before it, and for the reasons set forth below, the Court respectfully **OVERRULES** Defendant's oral objection and **DENIES** the Motion.

**BACKGROUND**

### I.      Factual Background

The following facts are drawn from the Parties' Joint Stipulated Facts or evidence admitted at the October 28 Preliminary Injunction Hearing, unless otherwise noted.  Plaintiff Paul Archer is a candidate for election to the 37th District of the Colorado House of Representatives.  [Doc. 23 at ¶ 1].  Plaintiff Archer for Colorado is a registered Colorado Candidate Committee, established to receive contributions and to make expenditures for Mr. Archer's campaign.  [*Id.* at ¶¶ 2, 6].  Defendant Jena Griswold is the Secretary of State for the State of Colorado, and is responsible for interpreting and enforcing Colorado's campaign finance laws.  [*Id.* at ¶¶ 3–4].  Colorado law requires candidates who receive contributions to do so through a candidate campaign committee. [*Id.* at ¶ 5].

Article XXVIII of the Colorado Constitution ("Article XXVIII") is the "primary campaign finance law in Colorado." *Colo. Ethics Watch v. Senate Majority Fund, LLC*, 269 P.3d 1248, 1253 (Colo. 2012).  Article XXVIII limits contributions to state legislative candidates to $200 for the primary election and $200 for the general election.  [Doc. 23 at ¶ 7].  Section 4 of Article XXVIII creates the framework for Colorado's voluntary spending limits ("VSL").  [*Id.* at ¶ 8].  If a candidate accepts the voluntary spending limits, Colorado imposes two restrictions on that candidate's campaign activities.  [*Id.* at ¶ 9].  The first restriction on a candidate's campaign activities, when that candidate has accepted voluntary spending limits, is that such a candidate may not contribute to their own campaign committee more than the political party contribution limit, which for the 2022 election cycle is $17,625.  [*Id.* at ¶ 10].  The second restriction on a candidate's

2

campaign activities, when that candidate has accepted voluntary spending limits, is that such a candidate may not spend more than a certain overall amount for the candidate's campaign, which for the 2022 election cycle is $88,225. [*Id.* at ¶ 11]. Candidates who accept voluntary spending limits may, if another candidate in their race declines to accept such limits and the non-accepting candidate has raised more than ten percent of the applicable voluntary spending limit, receive twice the contribution amount, for a total of $800 combined for the primary and general election. [*Id.* at ¶ 12]. Candidates who accept voluntary spending limits may also advertise to voters their acceptance of campaign spending limits. [*Id.* at ¶ 13].

The candidate affidavit process happens online through TRACER, Colorado's campaign finance database. [*Id.* at ¶ 14]. This has been the case since 2012, when the then-Secretary of State for Colorado promulgated a rule—8 CCR 1505-6, Rule 2.3—requiring the affidavit process to occur fully online. [*Id.* at ¶ 14]. First, a candidate fills out a form indicating the office, and election, they seek. [*Id.* at ¶ 15]. Then they are taken to a fillable form that includes a section describing Colorado's VSL program. [*Id.* at ¶ 16]. If the candidate chooses to participate in the VSL program, they check the box on the form. The box is not pre-checked. And the language related to VSL appears in three paragraphs and begins: "By checking the voluntary spending limits box, I agree that I am accepting the applicable campaign spending limits for this office." [*Id.*; Ex. 14].[3] Once a candidate hits "submit," the affidavit is also automatically sent to the Secretary's office for processing. The Secretary's Campaign Finance team, and sometimes the Ballot Access team, reviews the affidavit to ensure the candidate meets the necessary qualifications. For example,

---

[3] When referring to evidence in the record, this Court cites to exhibits as admitted during the Preliminary Injunction hearing.

that the ballot deadline for that election has not passed, or that the candidate's address lies within the district they are running to represent. [Doc. 23 at ¶ 17].

On or about February 22, 2022,[4] Mr. Archer completed an electronic "candidate affidavit." [*Id.* at ¶ 19]. The candidate affidavit states "I also acknowledge that I am accepting Voluntary Campaign Spending Limits." [Ex. 8]. Mr. Archer testified that while he had the option to do so, he did not download a copy of the candidate affidavit at that time or until after June 29, 2022. [Tr. at 73:13-25, 74:1]. The Secretary recorded Mr. Archer as having voluntarily chosen campaign spending limits. [Doc. 23 at ¶ 20; Ex. 8]. On or about February 25, 2022, the Secretary of State sent an email communication to Mr. Archer confirming receipt of his candidate affidavit, and the email did not state that Mr. Archer had accepted voluntary spending limits. [Doc. 23 at ¶ 21; Ex. 7]. Mr. Archer's public-facing TRACER homepage included language identifying Mr. Archer as having accepted VSL. [Doc. 23 at ¶ 25; Ex. 30]. In addition, TRACER work spaces for Mr. Archer as well as for the Archer Candidate Campaign also reflect "VSL Acceptance: Yes." [Ex. 31].

On or about June 16, 2022, Mr. Archer contacted the Colorado Secretary of State office regarding a campaign finance penalty notice. [Tr. at 145:1–7]. On or about June 29, 2022, Mr. Archer spoke with Garrick Frunz ("Mr. Frunz") who works at the Secretary's office and, as part of their conversation, Mr. Frunz informed Mr. Archer and his son, Andy Archer (who serves as the registered agent for the Archer Campaign Committee), that Mr. Archer had accepted VSL on the candidate affidavit filed in February 2022. [Doc. 23 at ¶ 22; Tr. at 145:11–25; 146:1–22]. On

---

[4] There was some ambiguity as to whether Mr. Archer completed his candidate affidavit on February 22, 2022, or February 24, 2022. *Compare* [Doc. 1 at ¶ 28] *with* [Doc. 19-1 at ¶ 19]. The Parties stipulated to the February 22, 2022 date, but the candidate affidavit is dated February 24, 2022. [Ex. 1-B].

August 12, 2022, Mr. Frunz informed Mr. Archer that the Secretary's office had made a determination that he could not revoke his VSL acceptance absent another candidate entering the race.  [Doc. 23 at ¶ 23; Tr. at 149:3–11].

## II.   Procedural Background

Plaintiffs subsequently initiated this action on September 7, 2022.[5]  *See* [Doc. 1].  In his Complaint, Plaintiff Archer alleges that he "did not agree to Colorado's voluntary campaign spending limits" in submitting his affidavit. [*Id.* at ¶ 29].  As a result, Plaintiffs assert two claims for relief.  First, as clarified at the Preliminary Injunction Hearing, pursuant to 42 U.S.C. § 1983, Plaintiffs assert that Defendant has violated their First Amendment rights by applying voluntary spending limits to Mr. Archer's candidacy when he did not agree to them through a voluntary, sworn acceptance before a notary public.  [*Id.* at ¶¶ 52–54].  Second, Plaintiffs assert that the use of an online, check-the-box, procedure as part of a candidate affidavit to consent to VSL violates Article XXVIII §§ 4 and 9(1)(c) of the Colorado Constitution.  [*Id.* at ¶¶ 56–64].  As a Prayer for Relief, Plaintiffs request (1) a declaration that the Secretary's enforcement of VSL against Plaintiffs be declared unconstitutional under the First Amendment of the United States Constitution; (2) a declaration that any purported acceptance of campaign spending limits by Plaintiff Archer be declared ineffective, because the Secretary failed to follow procedural safeguards in the Colorado Constitution; and (3) an order enjoining the Secretary from enforcing Colorado's voluntary spending limits against Plaintiff Archer and Archer for Colorado.  [*Id.* at 8].

On October 19, 2022, Plaintiffs filed the instant Motion seeking preliminary injunctive relief.  [Doc. 12].  The basis for Plaintiffs' Motion is, *inter alia*, that opponents and third-party

---

[5] The case was initially assigned to the Honorable Kristen L. Mix on September 7, 2022, was reassigned to the Honorable Daniel D. Domenico on October 6, 2022, and was again reassigned to this Court that same day.  [Doc. 8; Doc. 9].

actors have "spent $16,166.25 on mail pieces attacking [Mr.] Archer, and $16,166.25 on mail pieces supporting his opponent." [*Id.* at 13].  Plaintiffs also note that Mr. Archer's opponent has not accepted the spending limits, and has spent $105,660.61 thus far in this election.  [*Id.*].  In sum, Plaintiffs argue that "Archer must be able to communicate with voters to run a competitive campaign and to be able to respond to this independent group that has already spent substantial sums against him." [*Id.* at 14].  As relief, Plaintiffs seek a preliminary injunction "strik[ing] down" campaign finance restrictions on Mr. Archer.  [*Id.* at 17].

The Court scheduled a hearing on October 20, 2022, [Doc. 13], and Defendant submitted her timely Response on October 26, 2022, [Doc. 19].  On October 28, 2022, the Court conducted an evidentiary hearing regarding Plaintiffs' Motion.  [Doc. 13].  The Parties solicited testimony from eight witnesses:

1.    Terry Lloyd, a contributor to Plaintiff Archer's campaign;

2.    Charles Patrick Archer, a contributor to Plaintiff Archer's campaign and Plaintiff Archer's nephew;

3.    Carol Gibbs, Plaintiff Archer's administrative assistant and campaign volunteer;

4.    Plaintiff Paul Archer;

5.    Suzanne Taheri, an attorney and former employee at the Colorado Secretary of State's office;

6.    Garrick Frunz, an employee at the Colorado Secretary of State's office;

7.    Ammon Franklin, an acquaintance of Plaintiff Archer's; and

8.    Steve Bouey, Campaign Finance and Lobby Program Manager for the Colorado Secretary of State's office.

In addition, the Court accepted in evidence the following exhibits, all by stipulation of the Parties: Exhibits 1, 2, 3, 5, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 37, 38, 39.  [Doc. 26; Docs. ].  The Court considers testimony from each of the above witnesses, as well as all other evidence in the record, in reaching the conclusions outlined below.

## ANALYSIS

### I.   Outstanding Objection Regarding Alleged Hearsay

As an initial matter, the Court resolves the objection related to alleged hearsay that it elected to take under advisement at the October 28, 2022 hearing.  Specifically, the Court refers to Defendant's objection regarding testimony by Charles Patrick Archer ("Patrick Archer").  [Tr. at 12:11–22].  Mr. Patrick Archer[6] is Plaintiff Archer's nephew.  [*Id.* at 8:20–21].  He testified that an $800 donation to Plaintiff Archer's campaign committee was made on his and his wife's behalf, meaning that the contribution would total $400 each.  [*Id.* at 9:10–11].  He also testified that the money for the contribution was drawn from his "renter's account," and that his father made the donation for them.  [*Id.* at 9:14–19].

Defendant objected to this testimony, arguing that Mr. Patrick Arthur's statements regarding conversations with Charles Archer—the witnesses' father—constituted hearsay.  [*Id.* at 12:11–22].  Specifically, Defendant argued that "any knowledge of Charles Archer's contribution" should be excluded on the basis of hearsay.  [*Id.* at 12:12].  The Court took the objection under advisement.  [*Id.* at 12:21–22].  The Court understands that Defendant's objection was narrowly related to Mr. Patrick Archer's testimony "[t]hat Charles Archer's contribution was on behalf of

---

[6] Charles Patrick Archer represents that others normally refer to him as "Patrick Archer."  [Tr. at 10].  Based upon that representation, the Court will refer to Mr. Charles Patrick Archer as "Patrick Arthur" or "Mr. Patrick Arthur," to distinguish him from his father, who bears the name Charles Archer.

him and his wife." [*Id.* 12:19–20].   The pending question is whether Mr. Patrick Archer's testimony about his father's understanding of the contribution—that is, whether it was made by himself and his wife—constitutes hearsay.

The Court concludes that the answer is no.   Pursuant to Federal Rule of Evidence 801, hearsay is defined as any statement that "the declarant does not make while testifying at the current trial or hearing" or a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). A "statement" is a "person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). "Hearsay testimony is generally inadmissible." *United States v. Christy*, No. CR 10-1534, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011).   And at the hearing, Mr. Patrick Archer testified that he "sat down and talked" about the donation with his father, mother, and wife, and decided to withdraw $800 from "a renter's account" to contribute to Plaintiff Archer's campaign on his and his wife's behalf. [Tr. at 11:12–12:4].   At no point did Mr. Patrick Archer reference statements by his father, Mr. Charles Archer; his testimony referenced a conversation with his father, but only that they talked and that "that is how we all donated." [*Id.* at 12:3–4].   While Defendant objects specifically to the notion "that Charles Archer's contribution was on behalf of him and his wife," the Court does not observe any evidence in the record in which Mr. Patrick Archer relies—or references—statements by his father suggesting as much. [*Id.* at 19–20].

In sum, Mr. Patrick Archer's testimony that he had a conversation with his father is not hearsay, and his statement that it was his understanding that donations on behalf of him and his wife were made consistent with that conversation is likewise not hearsay.   As such, the Court **OVERRULES** Defendant's objection to that portion of Mr. Patrick Archer's testimony.

## II.        Preliminary Injunction

### A.        Legal Standard

A preliminary injunction is an "extraordinary remedy." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quotation omitted). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver, Colo.*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted).

A movant seeking a "disfavored" injunction bears a heightened burden, which may take one of three types:

> [A] disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win. To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor.

*Free the Nipple-Fort Collins*, 916 F.3d at 797 (citations and internal quotation marks omitted). In such cases, a motion for a preliminary injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). Plaintiffs ask this Court to "enjoin the Secretary from enforcing spending limits" upon themselves, and to "provide other relief as just and proper." [Doc. 12 at 18].

### B.    Applicable Standard

As an initial matter, this Court first turns to considering the applicable preliminary injunction standard.  First, the Parties disagree as to what constitutes the "status quo" in this action.  The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has explained that the "status quo" is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing."  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005).  In determining the status quo, courts are directed to look at the last peaceable uncontested status existing between the parties before the dispute developed."  *Id.* at 1260 (internal quotation marks omitted).  Plaintiffs argue that "the status quo is that people are allowed to make unlimited spending unless there is an election, and the very election here in the election of voluntary spending limits, is the very issue at dispute."  [Tr. at 250:13-18].  Defendant contends that the status quo is the acceptance by Mr. Archer of VSL.  [Doc. 19 at 6].  This Court respectfully finds that the status quo should be framed differently than proposed by either side.

Here. Mr. Archer does not challenge the overall application and enforcement of Article XXVIII's campaign finance regime to him.  *Cf. Lopez v. Griswold*, No. 22-cv-00247-JLK, 2022 WL 715122 (D. Colo. Mar. 10, 2022).  He further stipulates that the campaign affidavit process happens online through TRACER, Colorado's campaign finance database, and that this has been the case since 2012, when the then-Secretary promulgated a rule—8 CCR 1505-6, Rule 2.3—requiring the affidavit process to occur fully online.  [Doc. 23 at ¶ 14].  It is undisputed that on or about February 22, 2022, Mr. Archer filled out and submitted a candidate affidavit form.  [Doc. 23 at ¶ 19; Tr. at 35:1–7, 14–21].  The evidence in the record demonstrates that a candidate affidavit generated automatically upon submission and dated February 24, 2022 reflects that Mr. Archer accepted VSL [Ex. 8]; both public- and private-facing TRACER pages for Plaintiffs reflected

"VSL Acceptance: Yes" [Exs. 28, 30, 31; Tr. at 172:13–174:14]; Plaintiffs had attributed an $800 donation to a single donor on four occasions within TRACER without triggering any campaign finance complaint [Ex. 32]; and the filing of a candidate affidavit on behalf of Ammon Jones triggered a Notice of Ability to Withdraw Voluntary Acceptance of Campaign Spending Limits [Ex. 9].  Even the Complaint describes Mr. Archer's attempts after June 29, 2022 as actions to "amend or revoke" the designation of having accepted voluntary spending limits.  [Doc. 1 at ¶ 35].

Based on the factual record before the Court, the status quo, therefore, is not a time prior to Mr. Archer's submission of the candidate affidavit form on or about February 22, 2022 when no VSL designation would have been recorded for Plaintiffs.[7]  Rather, the status quo is the Secretary's application of Article XXVIII and 8 CCR 1505-6, Rule 2.3 to Plaintiffs in the ordinary course, which in this case resulted in the Secretary treating Plaintiffs as having accepted VSL pursuant to the candidate affidavit filed in February 2022.  [Tr. at 146:1–16].  In seeking to reverse that ordinary application of Article XXVIII and Rule 2.3, Plaintiffs seek to alter the status quo of the Secretary's treatment of Mr. Archer and the Archer Campaign Committee.  It is also undisputed that the relief sought by Plaintiffs—striking down restrictions imposed by Defendant on Plaintiffs —mandates action on the part of the Secretary to alter the information currently reflected in TRACER and how Plaintiffs are treated under the campaign finance rules.  Finally, the relief sought by the preliminary injunction – an order barring the Secretary from applying VSL to Plaintiffs -- would afford all of the relief Plaintiffs could recover after a full trial on the merits. *Compare* [Doc. 12 at 17] *with* [Doc. 1 at 8].  Thus, it follows that Plaintiffs must make a strong showing of likelihood of success on the merits and that the balance of harms tips in their favor.[8]

---

[7] Indeed, without such submission of a candidate affidavit form and the formation of a candidate campaign committee, it is unclear that Plaintiffs would have any standing to bring suit.

[8] Nevertheless, even if the Court did not apply the heightened burden to Plaintiffs, the Court would not reach a different substantive conclusion.

Based on the evidentiary record before it, the Court respectfully finds that Plaintiffs have failed to carry their burden that they are entitled to the preliminary injunctive relief they seek.

## C.    Discussion

The Court first turns to the Secretary's arguments that the preliminary relief sought by Plaintiffs should be denied on the basis of laches or the *Purcell* doctrine.  [Doc. 19 at 7–9].

### 1.    Likelihood of Success on the Merits

#### a.  Laches

Laches is an equitable doctrine that "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961).  It is a doctrine that "bars a party's dilatory claim" and "stems from the principle that equity aids the vigilant and not those who slumber on their rights." *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1090-91 (10th Cir. 2014) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002).  Courts have discussed these theories both under the prong of likelihood of success on the merits, *see e.g.*, *Garcia v. Griswold*, No. 20-cv-01268-WJM, 2020 WL 4926051, at *3–4 (D. Colo. Aug. 21, 2020) (endorsing a laches defense against a candidate seeking last-minute access to the ballot for Colorado's Democratic primary election for the United States Senate), or irreparable harm, *see Merced v. Spano*, No. 16CV3054 (SJ) (SMG), 2016 WL 3906646, at *2 (E.D.N.Y. July 14, 2016) (considering laches under the irreparable injury prong).  This Court is persuaded that it is more appropriately considered under the likelihood of success on the merits.  *See Garcia*, 2020 WL 4926051, at *3–4; *Noem v. Haaland*, 542 F. Supp. 3d 898, 915 (D.S.D. 2021) ("Whether the defense of laches applies is an appropriate consideration in evaluating the movant's likelihood of success on the merits.")*; Detroit Unity Fund v. Whitmer*, No. 20-12016, 2020 WL 6580458, at *3–5 (E.D. Mich.

Aug. 17, 2020) (considering laches argument in election challenge under likelihood of success on the merits prong of preliminary injunction test).

Regardless of the prong, courts have routinely expressed concerns regarding last-minute election-related challenges. *See, e.g.*, *Perry v. Judd*, 471 F. App'x 219, 227 (4th Cir. 2012) (unpublished) (noting that "applications for a preliminary injunction granting ballot access have been consistently denied when they threaten to disrupt an orderly election"); *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made."); *Merced v. Spano*, No. 16CV3054 (SJ) (SMG), 2016 WL 3906646, at *3 (E.D.N.Y. July 14, 2016) (expressing concern about impact of late-filed preliminary injunction motion on electoral process). At least one Court in this District has noted the same. *Garcia*, 2020 WL 4926051, at *3–4.

***Lack of Diligence.*** The first factor the Court considers in its laches analysis is whether the factual record reflects Plaintiffs' lack of diligence in asserting their claims. *See Costello*, 365 U.S. at 282. Plaintiff Archer submitted his candidate affidavit on or about February 22, 2022. [Doc. 23 at ¶ 19]. Although he received notification that his candidate affidavit had been accepted, he did not download a copy of it at that time. [Tr. at 73:23–24]. Mr. Archer did not review the affidavit until after June 29, 2022. [*Id.* at 73:10–22]. While he accessed the TRACER system multiple times, neither he nor his campaign staff noticed that both public-and private-facing TRACER pages denoted "VSL Acceptance: Yes." [Exs. 28, 30, 31; Tr. at 44:3–44:6; 75:75:7–16].

On June 16, 2022, Plaintiff Archer contacted Defendant's office to inquire about a campaign finance penalty letter. [Tr. at 145:1–3]. On June 29, 2022, Plaintiff Archer participated in a video call with Mr. Andy Archer, the registered agent for the Archer for Colorado campaign,

[*id.* at 145:19–21], and Mr. Frunz, and as part of that conversation, Mr. Frunz informed Mr. Archer that he had accepted voluntary spending limits.  [*Id.* at 146:17–22; Doc 23 at ¶ 22].  Messrs. Archer and Frunz subsequently discussed Mr. Archer's ability to revoke acceptance of voluntary campaign spending limits.  [Tr. at 155:10–18; Doc. 1 at ¶ 36(b)].  On August 12, 2022, Plaintiff Archer conclusively learned that the Secretary would not permit him to revoke his acceptance. [Doc. 19-2 at 3]. On September 7, 2022, Plaintiffs filed their Complaint in this action.  [Doc. 1]. They did not file the instant Motion until October 19, 2022.  [Doc. 12].

The Court concludes that these facts exhibit a lack of diligence on Plaintiffs' part.  The evidence demonstrates that as early as February 22, 2022, Plaintiffs could have confirmed Mr. Archer's VSL designation by downloading the candidate affidavit or checking the TRACER system.  The record as it currently stands before the Court reflects no attempt by Mr. Archer or the Archer Campaign Committee to confirm his VSL status.  There is no evidence that any action by Defendant precluded Mr. Archer or the Archer Campaign Committee from doing so.

The evidentiary record further reflects that Plaintiffs were aware of the Secretary's belief that Mr. Archer had accepted VSL by at least June 29, 2022, and that Defendant was treating Plaintiffs accordingly.  [Tr. at 36:10–13; 152:7–25].  As of June 29, 2022, Mr. Frunz discussed with Messrs. Archer that Mr. Archer was not eligible to simply withdraw from VSL at that time. [Tr. at 37:20–8:38:10].  Mr. Archer noted at that time that he would review the voluntary spending limits acceptance with his attorney.  [Tr. at 148:5–11].  Nothing in the record suggests that any actions or statements by the Secretary at that time gave Plaintiffs a reason to conclude that Defendant would reverse course.  Still, Plaintiffs did not bring suit at that time.

Mr. Archer then testified that after his June 29 conversation, he reviewed the Colorado Constitution and concluded that the Secretary's online candidate affidavit did not comport with

the Colorado Constitution before requesting another appointment with Mr. Frunz.  [Tr. at 38:8–40:6].  And while Mr. Archer continued discussions with the Secretary's office over the following forty-four days, Mr. Archer was conclusively notified that he would not be permitted to revoke his acceptance of the spending limitations by August 12, 2022.  [Doc. at 19-2 at 3].  Even then, this lawsuit was not filed for nearly another month, and the instant Motion was not filed until October 19, 2022—only twenty days before Election Day.

Plaintiffs argued that some of the delay was attributable to their counsel's illness.  [Tr. at 7:6–22].  But even putting aside the general proposition that parties are bound by the actions of their attorneys when considering delay, *cf. Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 688 (D. Colo. 2000), that delay arising from counsel's illness only accounts for the time period between the filing of the Complaint and the instant Motion.  [Tr. at 7:6–22].  It does not account for the time period between June 29, 2022, when Plaintiffs unequivocally understood that the Secretary considered them to be subject to VSL, and September 7, 2022, when the Complaint was filed.  Nor does it explain why, despite urgency noted in the Complaint, [Doc. 1 at ¶¶ 44–45], the Motion for Preliminary Injunction was not filed at that time, given the fact that there were minimal (if any) facts or evidence argued in the context of the instant Motion that were not available as of September 7, 2022.  *Compare* [Doc. 12] *with* [Doc. 1].  Indeed, the only admitted evidence potentially not available by the time of filing, September 7, 2022 at 3:43 p.m. [Doc. 1],[9] was the letter from the Secretary to Ammon Jones, a fictional third-party candidate [Ex. 10], and an email from Mr. Archer's friend, Ammon Franklin, to the Secretary about the delivery of

---

[9] A court may "take judicial notice of its own files and records, as well as facts which are a matter of public record." *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001).  The Court takes judicial notice of the time stamp associated with the filing of the Complaint as reflected in the ECF system.

Ammon Jones's candidate affidavit to his personal email [Ex. 35]—neither of which bear upon whether Plaintiffs' delay was somehow justified.

Finally, Plaintiffs briefly argued at the Preliminary Injunction Hearing that a potential failure to exhaust administrative remedies may have prevented them from bringing their suit at an earlier point. [Tr. at 248:9–14]. Respectfully, this Court is not persuaded. There is no allegation in the Complaint that Plaintiffs waited to file their action, which asserts two constitutional claims, because they had to first exhaust administrative remedies with the Secretary. *See generally* [Doc. 1]. Nor is it clear that the Secretary's consideration of Plaintiffs' request to amend or revoke Mr. Archer's VSL designation is properly considered an administrative remedy subject to exhaustion. What is clear is that Plaintiffs are proceeding under § 1983 for the purposes of their First Amendment claim. *See* [*id.* at 6]. As the Tenth Circuit has noted, "[i]t is beyond dispute that a plaintiff need not exhaust state administrative remedies before filing suit in federal court under § 1983." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 519 (10th Cir. 1998) (citing *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982). Accordingly, any concerns regarding exhaustion do not excuse Plaintiffs' delay in bringing suit or moving for a preliminary injunction with an election date of November 8, 2022—particularly given Plaintiffs' own assertion that with "each day that goes by [Mr.] Archer is limited in his campaign activities." [Doc. 1 at ¶ 44].

***Prejudice to Defendant.*** The laches inquiry also requires the Court to determine whether Defendant will be prejudiced by Plaintiffs' delay. Here, ballots have already been mailed to voters and returned to the Secretary's office. [Tr. at 191:11–16]. The Secretary is in the midst of counting ballots and administering November's election, which is one of the busiest periods for the Secretary's office. [*Id.* at 191:16–20]. The instant Motion was filed after ballots had been mailed and returned across the state, including in House District 37. [Doc. 19 at 20]. While the Court

recognizes that, at any point in an election, a lawsuit may require a commitment of resources from the Secretary's office, the delay in this case lasted for several months and until just under three weeks before the election. The Court believes that this delay is prejudicial to the Secretary, who is in the process of administering an ongoing election with an election in less than a week. As such, the Court respectfully concludes that Plaintiffs have not carried their burden as to the likelihood of success on the merits.

### b. The *Purcell* Principle

The Court is further persuaded that the principle articulated in *Purcell v. Gonzales*, 549 U.S. 1 (2006), counsels against granting Plaintiffs' requested preliminary relief at this late date. Briefly, *Purcell* holds that "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Id.* at 4. As such, it stands for the proposition that courts will not disrupt imminent elections absent a powerful reason to do so. *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."). In part, *Purcell*'s rationale rests upon the notion that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5.

The United States Supreme Court has recently echoed these points with greater specificity, noting that:

> When an election is close at hand, the rules of the road should be clear and settled. That is because running a statewide election is a complicated endeavor. Lawmakers initially must make a host of difficult decisions about how best to structure and conduct the election. Then, thousands of state and local officials and volunteers must participate in a massive coordinated effort to implement the lawmakers' policy choices on the ground before and during the election, and again in counting the votes afterwards . . . . The principle also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules

ahead of time, in the ordinary litigation process.  For those reasons, among others, *this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.*

*Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) (emphasis added).

Plaintiffs raise the argument that "*Purcell* . . . simply doesn't apply in this case," because this is a matter of campaign finance rather than the "voting procedures and election administration" that it normally concerns.  [Tr. at 226:19–23].  It is true that *Purcell* is typically implicated in other types of election disputes, but the Court respectfully finds that its logic—in large part, that federal courts should generally abstain from last-minute involvement in state election laws—extends to this dispute.  Instead, granting Plaintiffs' Motion would change how a candidate is required to elect to adopt VSL in Colorado and what information is—and has been—communicated to voters consistently throughout this election about House District 37 through, at a minimum, the Secretary's TRACER system.  [Tr. at 239:2–15].

Courts in this District and others have also debated the precise temporal limitations that govern the application of *Purcell*.  *See, e.g.*, *Walen v. Burgum*, No. 1:22-cv-31, 2022 WL 1688746, at *5 (D.N.D. May 26, 2022) ("If seven weeks before absentee ballots went out was too close in *Merrill*, surely a change to legislative district boundaries *after voting has actually begun would be too close now*." (emphasis added)); *Robinson v. Ardoin*, Civ. No. 22-211-SDD-SDJ, 2022 WL 2012389, at *58–61 (M.D. La. June 6, 2022) (granting injunctive relief despite *Purcell* where candidate qualifying did not begin for six weeks and primary was over 150 days away); *Holland v. Williams*, 457 F. Supp. 3d 979, 997 (D. Colo. 2018) (discussing the fact that *Purcell* was decided a month prior to an election, but that the instant action was being decided five months before the election).  But even without precise guidelines, the Court concludes that a motion filed less than

18

three weeks prior to this year's Election Day—November 8, 2022—clearly falls within *Purcell*'s proposition that voter confusion should be limited immediately before an election. *Purcell*, 549 U.S. at 4–5. Plaintiffs have not directed the Court to any authority to suggest otherwise, and this Court found none in its independent research.

A preliminary injunction issued one week before an election, which fundamentally alters how candidates are required to elect to have VSL apply as well as the information that has been provided to voters for months via the Secretary's TRACER system, would likely result in such confusion. Plaintiffs have therefore failed to carry their burden to show a likelihood of success on the merits, let alone a strong likelihood, in light of laches and the *Purcell* doctrine.[10]

### 2. Irreparable Harm

The second factor this Court considers at the preliminary injunction stage is whether the moving party is likely to suffer irreparable injury absent an injunction. *Winter*, 555 U.S. at 20. The Court notes again that injunctions that would mandate action or change the status quo are disfavored, and that as such Plaintiffs must make an especially strong showing as regards the irreparable harm analysis. *O Centro Espirita Beneficente Uniao Do Vegetal*, 389 F.3d at 975. And the "showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).

Here, Plaintiffs attempt to carry their burden by noting that the deprivation "of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

---

[10] Because the Court has concluded that Plaintiffs have not carried their burden with respect to likelihood of success on the merits, it "need not consider the other factors." *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 890 (10th Cir. 2021) (declining to consider the remaining factors where plaintiffs failed to show irreparable harm). For the avoidance of doubt, the Court passes on the other elements briefly.

injury." [Doc. 12 at 12 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976))]. Defendant counters by pointing to Plaintiffs' delay in raising this Motion, and notes that "a party's delay in seeking injunctive relief undermines that party's irreparable harm argument." [Doc. 19 at 18 (citing *Colo. Union of Taxpayers, Inc. v. Griswold*, No. 20-cv-02766-CMA-SKC, 2020 WL 6290380, at *3 (D. Colo. Oct. 27, 2020))].

As an initial matter, the Court recognizes that "delay is only one factor to be considered among others and there is no categorical rule that delay bars the issuance of an injunction." *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016). The operative question "is whether the delay was reasonable, was not a decision by the party to 'sit on its rights,' and did not prejudice the opposing party." *Id.*

***Reasonableness.*** The Court first considers whether Plaintiffs' delay was reasonable. Plaintiff Archer was aware that the Secretary construed his candidate affidavit to include an agreement to voluntary spending limits no later than June 29, 2022. [Tr. at 145:11–25; 146:1–22]. As discussed in detail above, Plaintiffs did not file their action at that time. Then, no later than August 12, 2022, Mr. Frunz informed Plaintiffs the Secretary would not permit revocation of Mr. Archer's VSL status. [Tr. at 149:3–11]. Yet despite the urgency of the campaign and the fact that ballots would be sent to voters in two months and Election Day was less than three months away, Plaintiffs did not file suit in August. Instead, Plaintiffs waited another month, until September 7, 2022, to file their Complaint. Then, they waited over another month, until October 19, 2022 to file the instant Motion. Respectfully, the Court concludes that this delay—approximately four months from Mr. Archer's June notification date, and forty-two days between the filing of his Complaint and filing of the Motion—is not reasonable given the exigency of the election cycle.

***Decision by the Party.***   Again, as discussed above, the Court finds no evidence in the record suggesting that Plaintiffs' delay in filing the instant Motion was the result of the Secretary or any other actor.   Plaintiffs focus their arguments with respect to delay on counsel's post-Complaint illness. [Tr. at 71:6–21].   But there is no evidence in the record that Plaintiffs were precluded from utilizing the services of other attorneys in lead counsel's firm to move for preliminary relief.   [*Id.* at 91:17–20].   Nor is there any evidence that Plaintiffs were somehow precluded from moving for a preliminary injunction at the same time they filed suit in September, particularly given their own recognition of the urgency of the matter.   Plaintiffs may have had reasons that they delayed the filing of the instant Motion, but no other party made that decision for them.

***Prejudice to Opposing Party.***   As the Court has already noted, testimony shows that the weeks preceding an election are the busiest time for the Secretary's office.   Litigating this dispute now therefore imposes a heavier burden upon the Secretary than in earlier weeks.   Moreover, ballots were mailed prior to the filing of Plaintiffs' Complaint.   [*Id.* at 149:3–11].   To ask the Secretary to revisit the candidate affidavit process or adjust information provided to voters *after* ballots have issued and voting has begun is an extraordinary remedy not justified by the evidence tendered by Plaintiffs.

The Tenth Circuit recognizes that: "delay in seeking [injunctive] relief cuts against finding irreparable injury." *Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs*., 31 F.3d 1536, 1543–44 (10th Cir. 1994) (quotation and citation omitted); *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("[A] party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm.").   Indeed, the evidence in the record shows that the instant Motion was filed after the

Secretary issued ballots.  [Tr. at 149:3–11].  Based on the evidence before it, the Court concludes that Plaintiffs have not made a strong showing as to irreparable harm.

### 3.   Balance of Equities

Turning to the balance of equities, the Court notes that neither Party has substantively addressed this factor.  Plaintiffs briefly argue that the balance-of-equities inquiry merges with the public interest inquiry when the government is an opposing party, but only addresses the latter point.  [Doc. 12 at 14–15].  Defendant does not address the third factor in her briefing.  [Doc. 19 at 20–21].  At oral argument, Plaintiffs only touched on the balance-of-equities inquiry in noting the importance of the Secretary's interpretation of state law, and that she would not be harmed by an injunction barring the enforcement of an "illegal procedure."  [Tr. at 233:14–21].

The Court respectfully finds that this factor favors Defendant, however.  While less important to the preliminary injunction analysis than the first two factors, the Court notes that Plaintiffs' alleged harm—even if the Court were to find in their favor at a later point in this litigation—is outweighed by the Secretary's interest in conducting an orderly election.  *See Garcia*, 2020 WL 4926051, at *5 (concluding that at a "very late hour, the Secretary's interest in ensuring that ballots are timely printed outweighs even a meritorious claim under the Constitution"); *see also Lopez*, 2022 WL 715122, at *10 ("Plaintiffs seek to enjoin a decades-old law on an expedited basis, without a fully developed factual record. The public has a significant interest in not suffering the reverberations of a federal court order that declares a constitutional referendum unconstitutional on the basis of an incomplete record.").

Though the Court is cognizant of Plaintiffs' alleged harms stemming from a prohibition upon spending sums in excess of Article XXVIII's voluntary contribution limits, the harm of an injunction would outweigh those Plaintiffs have raised.  The Secretary would need to remove

Plaintiff Archer's acceptance of voluntary spending limits from her website following the return of ballots to her office, and would potentially lead to further litigation from other candidates who wish to withdraw their acceptance of spending limits.  Court orders changing voter information at the eleventh hour could lead to confusion—a harm that, as discussed *supra*, the Supreme Court has cautioned federal courts to take very seriously.  *See Purcell*, 549 U.S. at 4–5.  The Court therefore concludes that the balance of equities weighs in Defendant's favor.

### 4.   The Public Interest

Finally, the Court considers the public interest in entering the requested injunctive relief. Plaintiffs principally contend that "it is always in the public interest to prevent the violation of a party's constitutional rights."  [Doc. 12 at 15 (citing, *inter alia*, *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016))].  The Court does not take these concerns lightly.  *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest.").  Defendant disagrees, pointing out that "giving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest." *Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir. 2020).  Defendant also notes that "[h]undreds of thousands of voters have already returned their voted ballots," and that therefore "the public interest is best served by enforcing Archer's choice to limit his expenditures."  [Doc. 19 at 20].

The Supreme Court has made clear that "orderly elections" lie in the public interest. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944–45 (2018).  Recognizing that interest, the Court respectfully concludes that the public interest would not be served by the entry of Plaintiffs' requested injunction.

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1)    Plaintiffs' Emergency Application for Preliminary Injunction [Doc. 12] is **DENIED**; and

(2)    A Telephonic Status Conference is **SET** in this matter for **November 9, 2022 at 11:00 a.m.**  The Parties shall participate using the following dial-in information: 888-363-4749; Access Code: 5738976#.

DATED:  November 2, 2022          BY THE COURT:

Nina Y. Wang
United States District Judge